IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CHERYL F. STAFFORD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. CIV-10-30-FHS |
| ) | |
| THE MCCURTAIN COUNTY JAIL TRUST; ) | |
| JASON LINCOLN, individually and in ) | |
| his official capacity as the Jail ) | |
| Administrator for McCurtain County,) | |
| Oklahoma; and JEANINE STEWART, ) | |
| individually, ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

Plaintiff, Cheryl F. Stafford ("Stafford"), alleges her constitutional rights were violated during the course of her incarceration at the McCurtain County Detention Center ("MCDC") from October 31, 2008, to December 7, 2008. In particular, Stafford contends Defendants delayed and/or denied adequate medical care for her complaints relating to high blood pressure, with the result being that Stafford "underwent craniotomy surgery to repair a subarachnoid hemorrhage with left posterior communicating artery aneurysm and left ICA bifurcation aneurysm." Second Amended Complaint, ¶ 10. Stafford filed this action under the authority of 42 U.S.C. § 1983 seeking compensatory damages against Defendants, The McCurtain County Jail Trust ("the Trust"), Jason Lincoln ("Lincoln"), and Jeanine Stewart ("Stewart"), for the claimed violation of her constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution for an alleged deliberate indifference to her serious medical needs. Stafford also asserts a claim against the Trust under Oklahoma law

1

"for the negligent disregard of Plaintiff's right to medical treatment." Second Amended Complaint, ¶ 18. Defendants have filed a Motion for Summary Judgment (Document No. 77) on the claims asserted against them by Stafford. For the reasons stated below, the Court finds that summary judgment should be granted in part and denied in part.

## Background

On Friday, October 31, 2008, at approximately 5:00 p.m., Stafford was booked into the MCDC on two counts of Unlawful Delivery of a Narcotic. As part of the booking process, Stafford informed the booking officer that she had high blood pressure and was taking the medication, lisinopril, for the condition. Stafford also completed a booking medical questionnaire listing her high blood pressure condition and the use of lisinopril for treatment. Stafford did not have the lisinopril or any other medication on her when she was booked into the MCDC. On Monday, November 3, 2008, the MCDC nurse, Vanessa Wendt ("Wendt"), conducted an initial medical screening by reviewing Stafford's medical questionnaire. Wendt did not physically meet with Stafford as part of this initial medical screening. Stafford's high blood pressure condition was reflected in the medical questionnaire. Wendt reviewed a medical questionnaire from a previous incarceration and confirmed that Stafford had a prescription for lisinopril. Wendt contacted the MCDC's Physician's Assistant, Jason McHenry, who authorized the filling of a prescription for lisinopril, 5 mg, 1 pill by mouth every day. Wendt called in the prescription and the medication was received the next day, November 4, 2008.

Stafford started taking the lisinopril medication on November 4, 2008. The Medication Given Log and the Medication Log (Exhibit

Nos. 5 and 6 to Document No. 77) indicate that Stafford received her lisonpril medication every day from November 4, 2008, through December 6, 2008. Stafford testified in her deposition (Exhibit No. 4 to Stafford's Response to Defendant's Motion for Summary Judgment (Document No. 80)("Stafford Deposition")), however, that on two occasions she received half a pill, which she said was another dosage cut in half to substitute for her one-pill prescription. Stafford stated she was told by jail personnel that this substitute pill was given to her on these two occasions because the MCDC had run out of her pills. Stafford testified that on one of the occasions it was Stewart, a MCDC detention officer, who gave her this substituted medication. Stafford contends she became dizzy and had headaches on both of the occasions when the substituted medication was given to her. Stafford asserts that she told "every jailer that came through there from the first time I took it until the time I had my aneurysm explode in my head." Stafford Deposition, p. 58, lines 22-24. Although she can't identify the full names of the jailers, Stafford does state that Stewart was one of the jailers she told about her problems with dizziness and headaches. Id. at p. 59, line 15. Stafford also contends she requested to see a nurse through written sick call requests, but that she never saw a nurse or other health care provider during her stay at the MCDC. Id. at p. 61, lines 8-25 and p. 62, lines 1-25, p. 63, lines 1-6. According to Stafford, the only response to her requests was from Rhonda Weeks, a MCDC detention officer, who gave Stafford some Ibuprofen a couple of times. Id. at p. 62, lines 14-25. In their affidavits, Wendt, Stewart, and Lincoln assert that at no time prior to December 7, 2008, did Stafford complain to any of them that she needed medical care or additional treatment for her high blood pressure, nor were they ever made aware that Stafford had requested any such medical care or treatment. Exhibits 3, ¶ 6, Exhibit 7, ¶ 10, and Exhibit

3

9, ¶ 4 to Document No. 77. Moreover, it is undisputed that Lincoln, the Jail Administrator for the MCDC, never spoke to or saw Stafford during her incarceration. Lincoln's involvement is limited to his actions as Jail Administrator, in particular, his implementation of a record keeping change for the requests for medical attention made by inmates. Lincoln deposition testimony establishes that instead of maintaining a separate sick call log, the MCDC changed the record keeping procedure to record the date and time of each medical request on the request itself. Exhibit 5, pp. 33-34 and 46-47 to Document No. 80.

On December 7, 2008, Stewart was in the MCDC women's control room when she was notified by inmate, Courtney Bone, that Stafford was in distress. Stewart came to Stafford's pod and observed Stafford snoring loudly and drooling while she was lying on her stomach on her bunk. Stewart believed Stafford was having a seizure. Stewart attempted to wake Stafford. After a few moments, Stafford woke up but was initially unresponsive. Stafford then told Stewart that she could not feel anything including her arms and legs. Contact was made with Emergency Medical Services and they were asked to respond to the MCDC. While waiting for an ambulance to arrive, Stafford informed Stewart that she felt a twinge in her neck. The ambulance arrived and transported Stafford to the emergency room at McCurtain Memorial Hospital. Stewart followed the ambulance to the hospital in her squad car. After arriving at the hospital, Stewart received a phone call from the MCDC informing her that an inmate in the pod where Stafford was located reported that she believed Stafford may have been using methamphetamine that morning. Stewart reported this information to the nurse who was attending to Stafford. At the time the methamphetamine usage information was reported to the nurse, the emergency room doctor, Dr. Mark Gregory ("Dr. Gregory"), had

4

already ordered lab work, including a urine and blood sample for drug screening, and CT scans of Stafford.[1] Dr. Gregory reviewed the results of the testing and reported that all the lab work was normal, but that he was concerned about two arteries in Stafford's head. Dr. Gregory believed that Stafford should receive further testing and examinations at the OU Medical Center in Oklahoma City. Stewart contacted her supervisor, Scott McClain, who contacted the Court Liaison Officer, Jason Ricketts ("Ricketts"), to assist in having Stafford released from custody in order to receive further medical treatment. Ricketts contacted District Judge Willard Driesel, who ordered Stafford released from custody and she was airlifted to the OU Medical Center. After further testing and diagnosis, Stafford underwent craniotomy surgery to repair a subarachnoid hemorrhage.

The MCDC has a written policy regarding medical services for inmates. Exhibit No. 11 to Document No. 77. This policy provides that "inmates can make medical complaints daily for review by qualified medical personnel to insure appropriate medical attention." Id. at section 6.04. Inmates can make written as well as oral requests for medical care and these requests are delivered to the nurse. Id. at 6.04(2). The MCDC also has a written policy for medications/pharmaceuticals which includes a procedure for

---

[1] Stafford contests whether or not the drug screen ordered by Dr. Gregory was made before the report of methamphetamine use was made by Stewart. Stafford, however, offers no evidence to contest Stewart's deposition testimony (Exhibit 4, p. 53, lines 19-24 to Document No. 77), Stewart's affidavit and the Jail Incident Report (Exhibit 7 to Document No. 77), and the hospital Patient Progress Notes (Exhibit 8 to Document No. 77) otherwise. These documents establish that routine lab work, including drug screening, had already been ordered before Stewart informed the emergency room nurse of the report of possible methamphetamine use by Stafford.

5

administering prescription medications.  Id. at 6.06(7).

In their Motion for Summary Judgment (Document No. 77), Defendants make several arguments.  First, Defendants claim Stafford has failed to demonstrate a violation of her constitutional rights pursuant to 42 U.S.C. § 1983 for the delay and/or denial of medical attention.  Second, Lincoln and Stewart contend they are entitled to qualified immunity in their individual capacities with respect to Stafford's claims pursuant to 42 U.S.C. § 1983.  Finally, Defendants claim they are immune from suit for Stafford's negligence claims brought under the authority of state law.

### **Summary Judgment Standards**

The standards relevant to the disposition of a case on summary judgment are well established.  Having moved for summary judgment in their favor under Rule 56 of the Federal Rules of Civil Procedure, Defendants' initial burden is to show the absence of evidence to support Stafford's claims.  Celotex v. Catrett, 477 U.S. 317, 325 (1986).  Defendants must identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which establish the absence of any genuine issue of material fact.  Universal Money Centers v. AT&T, 22 F.3d 1527, 1529 (10th Cir. 1994)(quoting Fed. R. Civ. P. 56(c)).  Defendants need not negate Stafford's claims or disprove her evidence, but rather, their burden is to show that there is no evidence in the record to support her claims.  Celotex, 477 U.S. at 325.  Stafford, as the nonmoving party, must go beyond the pleadings and "must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which [she] carries the burden of

proof." Applied Genetics v. First Affiliated Securities, 912 F.2d 1238, 1241 (10th Cir. 1990).

Summary judgment is not appropriate if there exists a genuine material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-51 (1986). "A fact is 'material' only if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Thomas v. IBM, 48 F.3d 478, 486 (10th Cir. 1995) (quoting Anderson, 477 U.S. at 248). In this regard, the court examines the factual record and reasonable inferences therefrom in the light most favorable to Stafford. Deepwater Invs. Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). This court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

As part of the summary judgment motion before the court, the individual Defendants, Lincoln and Stewart, claim an entitlement to qualified immunity. The affirmative defense of qualified immunity is available to all government officials. Harlow v. Fitzgerald, 457 U.S. 800 (1982). This immunity is an immunity from suit and not merely a defense to liability. Pueblo Neighborhood Health Centers v. Losavio, 847 F.2d 642, 644-45 (10th Cir. 1988) and England v. Hendricks, 880 F.2d 281 (10th Cir. 1989). The test the court must apply is an objective one which inquires into the objective reasonableness of the official's actions. Harlow, 457 U.S. at 816. Government officials performing discretionary functions will not be held liable for their conduct unless their actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818;

7

see also Clanton v. Cooper, 129 F.3d 1147, 1153 (10th Cir. 1997)(quoting Harlow).

Certain standards apply when a court is called upon to rule on a qualified immunity defense at the summary judgment stage of the proceedings. The Supreme Court has clarified the standards for reviewing summary judgment motions raising the defense of qualified immunity. Saucier v. Katz, 533 U.S. 194 (2001). As a threshold inquiry, the court must determine whether the facts as alleged, taken in the light most favorable to the plaintiff, show that a defendant's conduct violated a constitutional right. Id. at 201. This purely legal determination allows courts to "weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on its merits." Siegert v. Gilley, 500 U.S. 226, 232 (1991). If the plaintiff cannot meet this burden on this threshold inquiry, then the qualified immunity analysis need not be extended any further, and the defendant prevails. Saucier, 533 U.S. at 201. On the other hand, should a plaintiff carry this initial burden of showing a constitutional violation, then, "the next, sequential step is to ask whether the right was clearly established." Id. In this context, the inquiry becomes "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. This inquiry is undertaken in the specific context of the case, and not as a broad general proposition. See id.

### Constitutional Right to Adequate Medical Care

In Estelle v. Gamble, 429 U.S. 97 (1976) the Supreme Court addressed the Eighth Amendment's prohibition against cruel and unusual punishment in the context of medical attention and stated:

8

> "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under §1983." (Citations and footnotes omitted).

Id. at 104-05.[2] Thus, it is clear that deliberate indifference may be exhibited in the form of intentional denial or delay in providing access to medical treatment or intentional interference with treatment. Id. at 104-05.

The deliberate indifference necessary for an Eighth Amendment violation has both an objective and subjective component. Farmer v. Brennan, 511 U.S. 825, 834 (1994). The objective component requires a medical need which is sufficiently serious. A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980)(quotation omitted). In the context of a delay in medical treatment, an aggrieved plaintiff must establish substantial harm. Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005). "The substantial harm requirement 'may be established by lifelong handicap,

---

[2] The Fourteenth Amendment's Due Process Clause entitles pretrial detainees such as Stafford the same degree of protection regarding medical attention as that afforded convicted inmates under the Eighth Amendment. Frohmader v. Wayne, 958 F.2d 1024, 1028 (10th Cir. 1992). Thus, Stafford's claim for inadequate medical attention requires a showing of "'deliberate indifference to serious medical needs.'" Estate of Hocker v. Walsh, 22 F.3d 995, 998 (10th Cir. 1994)(quoting Estelle v. Gamble, 429 U.S. at 104.

9

permanent loss, or considerable pain.'" Id. (quoting Garrett v. Stratman, 254 F.3d 946, 950 (10th Cir. 2001)). With respect to the subjective component, a plaintiff must establish that a defendant knew of his serious medical need and "fail[ed] to take reasonable measures to abate it." Farmer, 511 U.S. at 847; see also Barrie v. Grand County, 119 F.3d 862, 869 (10th Cir. 1997)("'[A]n official . . . acts with deliberate indifference if [his] conduct . . . disregards a known or obvious risk that is very likely to result in a violation of a prisoner's rights.'"). "A negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." Perkins v. Kansas Dept. of Corrections, 165 F.3d 803, 811 (10th Cir. 1999)(citing Estelle, 429 U.S. at 105-06). Likewise, a prisoner's disagreement with a prescribed course of treatment does not state a constitutional violation. Olson v. Stotts, 9 F.3d 1475, 1477 (10th Cir. 1993).

Stafford makes several arguments with respect to her claim that medical care was denied or delayed – some specific to Stewart and others in broad sweeping terms not linked to Stewart. Initially, Stafford contends she was never seen by a nurse or other medical profession during her stay at the MCDC. While the record confirms Stafford's contention, the record also establishes that an initial screening, consisting of the documentation of Stafford's medical history and the completion of a medical questionnaire, was conducted during the booking process. Nurse Wendt reviewed the initial screening materials and made arrangements to secure the lisinopril prescription to treat Stafford's high blood pressure. The medication was secured and given to Stafford on Tuesday, November 4, 2008 – four days after she was booked into the MCDC. Conducting an initial medical screening of this sort and securing medication four days after such medical screening does not

10

constitute deliberate indifference to the serious medical needs of Stafford. The medical information was obtained from Stafford upon booking on Friday, October 31, 2008, a qualified nurse reviewed the information on Monday, November 3, 2008, and the medication was secured and given to Stafford on Tuesday, November 4, 2008. These were reasonable measures undertaken within a reasonable time frame to address Stafford's medical condition. This is especially true in light of the undisputed fact that Stafford did not have her medication or her prescription information with her when she was arrested and booked on October 31, 2008. This conduct certainly does not exhibit deliberate indifference to Stafford's serious medical needs. See Williams v. Dallas County, 2003 WL 21662823, at ** 4 (N.D. Tex., July 14, 2003)(eight-week delay in receiving desired blood pressure medication is not deliberate indifference); Ayala v. Terhune, 2006 WL 2355153, at ** 3 (3rd Cir. 2006)(sporadic delays in providing prescription medication for ulcerative colitis – none exceeding four days at any one time – do not amount to deliberate indifference).

Stafford also contends that on one occasion prior to the December 7, 2008, incident, Stewart administered a medication to her which was not the one she was prescribed. In addition to the fact that this contention is inconsistent with the Medication Given Log and the Medication Log (Exhibits Nos. 5 and 6 to Document No. 77), the record is clear that the pill provided to Stafford on this occasion was a higher dosage of the same medication, cut in half in order to fill her medication as prescribed. Stewart's conduct on this single occasion is not indicative of deliberate indifference towards Stafford. To the contrary, the reasonable inference to be drawn from Stewart's conduct is one of concern for the well being of Stafford. There is simply no evidence to suggest Stewart knew that the substitution of an equivalent medication would impose an

11

excessive risk of harm to Stafford.

Stafford next contends Stewart caused a delay in medical treatment after she was taken to the hospital by informing the hospital staff of a report that Stafford had taken methamphetamine earlier that morning. Stafford contends this report delayed treatment of her until a drug screening analysis had been run. The Court finds no evidence to support this contention. The record before the Court in the form of Stewart's deposition testimony, Stewart's affidavit, the Jail Incident Report, and the hospital Patient Progress Notes all establish that the emergency room doctor, Dr. Gregory, had already ordered blood and urine testing, including a drug screening, before Stewart informed the emergency room nurse of the report of the potential methamphetamine use by Stafford. No evidence has been presented to suggest, much less establish, that Stewart's reporting caused any delay in the medical treatment afforded Stafford. Stafford's contention otherwise is mere supposition on her part. Moreover, to the extent it is assumed that Stewart reported this information before any testing was ordered, the transmission of clearly pertinent medical information to treating medical professionals in no way evidences deliberate indifference to the serious medical needs of the patient.[3] The medical decisions made by the hospital with respect

---

[3] Stafford attempts to create an issue of fact precluding summary judgment by maintaining that Stewart has not identified the inmate reporting the methamphetamine use by Stafford and by relying on the fact that the drug screening results were negative. The identify of the inmate and the results of the drug screening tests are not relevant, however, to the inquiry at hand. Stewart's testimony is that she received a call from a MCDC *staff member* who relayed an inmate's report of methamphetamine use to Stewart. Stafford offers nothing to refute Stewart's testimony in this regard. Once Stewart had knowledge of such a report it was perfectly reasonable - as opposed to some suggestion of deliberate indifference - to relay

to the care and treatment of Stafford after she was admitted to the hospital cannot be attributed to Stewart. See Spruill v. Gillis, 372 F.3d 218, 236 (4th Cir. 2004)(not appropriate to hold a non-medical prison official liable under an inadequate medical care theory where the prisoner was under a physician's medical care).

There is one factual dispute, however, which precludes the issuance of summary judgment in favor of Stewart. Stafford contends she requested, both verbally and in writing, that she be allowed to see a nurse to address her problems with dizziness and headaches. Stafford identifies Stewart as one of the jailers to whom these requests were directed. According to Stafford, these requests were ignored and she never saw a nurse or any other health care provider during her stay at the MCDC. Stewart denies Stafford made any such requests to her and denies she was ever made aware of any requests for additional medical care and treatment by Stafford. Taking these facts in the light most favorable to Stafford, however, a case of deliberate indifference to Stafford's serious medical needs could be established. See Sealock v. Colorado, 218 F.3d 1205, 1208-1211 (10th Cir. 2000)(reversing the entry of summary judgment in a case for deliberate indifference for delay in medical treatment asserted against a prison shift commander who was informed that inmate might be having a heart attack and was present when inmate displayed symptoms consistent with a heart attack - the shift commander also allegedly refused to drive the inmate to the hospital and told the inmate "Just don't die on my shift. It's too much paper work."). Stafford's version of the facts establishes a serious medical condition - high blood pressure accompanied by dizziness and headaches - and Stewart's delay/denial of requested

---

the information to the medical personnel treating Stafford. The outcome of any drug screening adds nothing to the deliberate indifference analysis.

care and treatment. For the purposes of summary judgment evaluation, Stafford has satisfied both the objective and subjective prongs of the deliberate indifference to serious medical needs test. The factual dispute as to the existence of any requests by Stafford to Stewart for additional medical care precludes the issuance of summary judgment in favor of Stewart on the underlying constitutional claim. Likewise, this factual dispute results in the rejection of Stewart's qualified immunity defense as Stafford has shown that, under her version of the facts, Stewart violated her clearly established constitutional right to adequate medical care. It will be for the jury to determine which version of the facts to believe.

Turning to Stafford's claim against Lincoln, the Court notes that the successful assertion of a section 1983 claim in the context of medical attention requires a showing of a defendant's personal participation. Grimsley v. Mackay, 93 F.3d 676, 679 (10th Cir. 1996). "[S]upervisor status by itself is insufficient to support liability," Mitchell v. Maynard, 80 F.3d 1433, 1441 (10th Cir. 1996), and a supervisor will not be liable in a section 1983 action for the acts of his subordinate "unless an 'affirmative link' exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." Fogarty v. Gallegos, 523 F.3d 1147, 1162 (10th Cir. 2008) (quoting Butler v. City of Norman, 992 F.2d 1053, 1055 (10th Cir. 1993).

With respect to Lincoln, it is undisputed that he never spoke to or saw Stafford during the period of her incarceration at the MCDC. No evidence has been presented that Lincoln participated in the alleged denial or delay of medical care to Stafford. Moreover, with respect to the alleged denial of medical care by Stewart,

there has been no evidence presented to link Stewart's alleged constitutional deprivation in this regard with any failure on the part of Lincoln to supervise or train Stewart in the handling of medical complaints by inmates. A procedure for addressing medical complaints exists at the MCDC - the issue that is unresolved relates to whether Stewart adhered to such policy. This unresolved issue is not linked to admissible evidence establishing a lack of supervision or training on the part of Lincoln with respect to Stewart's handling of medical complaints. Consequently, no basis exists for the imposition of liability against Lincoln in his individual capacity.

### Liability of the Trust

Stafford's case for liability against the Trust rests primarily on her contention that Lincoln, as the *de facto* policy maker for the Trust, discontinued the use of the sick call log to document requests by inmates for medical assistance. A municipality or governing body, such as the Trust, cannot be held liable in a section 1983 action for the acts or omissions of its employees or agents on the basis of respondeat superior. Monell v. New York City Dept. of Social Services, 436 U.S. 658, 694-95 (1978). "It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under §1983." Springfield v. Kibbe, 480 U.S. 257, 267 (1987) (O'Connor, J., dissenting) (quoting Monell, supra, at 694). The municipality itself must cause the constitutional violation in the sense that "[a]t the very least there must be an affirmative link between the policy and the particular constitutional violation alleged." Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1984). As reiterated by the Supreme Court, a municipality is only liable when the official policy is the

15

"'moving force' behind the injury alleged." Board of County Commissioners v. Brown, 520 U.S. 397, 404 (1997). Moreover, when the municipal policy itself does not violate federal law and it is, in fact, lawful on its face, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Id. Stafford argues that because of Lincoln's change in the sick call policy there is no way to test the veracity of the statements by Lincoln, Stewart, and Wendt to the effect that Stafford never requested additional medical attention. This argument fails to support a claim of municipal liability against the Trust as it is merely a claim addressing the ability of the parties to present an evidentiary record in support of their respective positions. More importantly, the record does not support Stafford's argument. The only evidence on this point is from Lincoln who testified in his deposition as to a record keeping change regarding medical requests by inmates. Rather than keeping a separate sick call log, the MCDC has, for some time, been logging medical requests by noting the date and time of each medical request on the request itself, and not on an independent sick call log. This change in procedure by Lincoln did not eliminate an evidentiary record of such medical requests and it does not suggest that Lincoln has been transformed into the policymaking authority for the Trust on issues involving inmate care and treatment. Consequently, Lincoln's institution of an alternate method of record keeping for inmate medical requests fails to sustain any basis for liability against the Trust.

In her response brief, Stafford also suggests the Trust is liable for its failure to train and supervise Lincoln and for its "cascading abdication of responsibility" with regard to Lincoln's administration of the MCDC. In this regard, Stafford points to Lincoln's training being limited to that of a detention officer,

Lincoln's lack of a college education, Lincoln's lack of preparation for Trust board meetings, and the Trust's failure, in general terms, to more fully supervise the operations of the MCDC. These arguments must fail as the only allegation against Lincoln of a constitutional violation - the changing of the record keeping procedure for processing medical complaints - has been found to be insufficient as a matter of law. Without any constitutional violation flowing from the actions of Lincoln, no case for municipal liability can be made against the Trust as pled by Stafford.[4] See Myers v. Oklahoma County Bd. of County Com'rs, 151 F.3d 1313, 1316 (10th Cir. 1998)("It is well established, therefore, that a municipality cannot be held liable under section 1983 for the acts of an employee if a jury finds that the municipal employee committed no constitutional violation.").

### State Law Claim

Stafford' asserts a state law claim for "negligent disregard of Plaintiff's right to medical treatment" against the Trust.[5]

---

[4] As to the only remaining constitutional claim involving Stewart, no claim of lack of training has been made; thus, there is absolutely no evidence to suggest the Trust knew of and disregarded the substantial risk of inadequate training with respect to Stewart, as to the handling of requests by inmates for medical assistance, sufficient to impose municipal liability on the Trust. See Canton v. Harris, 489 U.S. 378, 388 (1989)("inadequacy of police training may serve as the basis for § 1983 [municipal] liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact"). As previously stated, the defining issues herein are simply whether Stafford made her complaints and requests known to Stewart and whether Stewart refused to act on such complaints or requests.

[5] It is undisputed that the Trust is a public trust created pursuant to Oklahoma law for the purposes of the operation and management of the jail and detention facilities of McCurtain
17

Second Amended Complaint, ¶ 18. As a "political subdivision" pursuant to section 152(8)(d) of the OGTCA, the Trust is exempt from tort liability for such negligence claim. See Medina v. State, 871 P.2d 1379 (Okla. 1993)(dispensing of medicine by state employee is a function within the operation of a penal institution entitling the State to the exemption from liability under the OGTCA.). Section 155 (24) of the OGTCA provides that "[t]he state or a political subdivision shall not be liable if a loss or claim results from . . . [p]rovision, equipping, operation or maintenance of an prison, jail or correctional facility." The provision of medical care to inmates within the MCDC is a function performed within the operation of the correctional facility; consequently, the Trust is exempt from liability under the OGTCA. Id. at 1384.

Stafford, however, cites Prichard v. City of Oklahoma City, 975 P.2d 914 (Okla. 1999) in support of her claim that section 155(24) does not provide the Trust with immunity from suit for negligence claims arising from the operation of its jail. Stafford's reliance on Prichard is misplaced. Prichard involved an arrestee's claim for inadequate medical care against the City of Oklahoma City for its arresting officer's failure to provide medical care *before he was taken to jail*. The Oklahoma Supreme Court determined that the City of Oklahoma City was not immune from liability as the arresting officer's actions were not related to the "method of providing . . . police . . . protection" as

---

County, Oklahoma. Given this status, the Trust qualifies as a "political subdivision" under the Oklahoma Governmental Tort Claims Act ("OGTCA"), 51 O.S. § 152(8)(d). Stafford concedes that there is no basis for liability on her state law negligence claim against either Lincoln or Stewart, as they were acting within the scope of their authority at all relevant times. Section 163(c) of the OGTCA, provides that employees of a political subdivision are entitled to immunity for torts committed within the scope of their employment.

contemplated by section 155(6) of the OGTCA. The instant case, however, involves a claim by Stafford for lack of medical care *while incarcerated*, not a claim arising from conduct before being incarcerated. Consequently, Prichard in no way negates the immunity provisions applicable to jail operations pursuant to section 152(24).[6] As Stafford's remaining claim relates to the alleged denial of medical care at the MCDC, the immunity from suit provided by section 152(24) operates in favor of the Trust and bars such state law claim against it.

## Conclusion

Based on the foregoing reasons, Defendants' Motion for Summary Judgment (Document No. 77) is granted in all respects, with the exception of Stafford's section 1983 claim against Stewart for inadequate medical care.

It is so ordered this 7th day of June, 2011.

*/s/ Frank H. Seay*
Frank H. Seay
United States District Judge
Eastern District of Oklahoma

---

[6] In fact, the Oklahoma Supreme Court in Prichard did not determine the application of section 155(24). Prichard, 975 P.2d at 915, n. 4.